**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| *v.* | |
| **SHAHEED SPRINGS** | **NO. 25-310-KSM-1** |

**MEMORANDUM**

**MARSTON, J.**                                                              **February 4, 2026**

Defendant Shaheed Springs has been charged with possession of a firearm and

ammunition after previously being convicted of a crime punishable by more than a year's

imprisonment, in violation of 18 U.S.C. § 922(g)(1).  (Doc. No. 1.)  He now moves to suppress

the firearm and ammunition[1] on which the charge is based, arguing that this evidence was

obtained through an illegal seizure and search.  (Doc. No. 20.)

The Court held an evidentiary hearing on Defendant's motion to suppress on January 12,

2026.  (*See* Doc. No. 27.)  During the hearing, Philadelphia Housing Authority ("PHA") Police

Officer Darnell Ross testified on behalf of the Government.  (*See* Rough Draft Jan. 12, 2026

Hr'g Tr. at 4:11–77:14.)  The Government also introduced Officer Ross's body camera footage

from the night in question (Gov't Hr'g Ex. 1); the body camera footage of Officer Hatter,[2] who

was with Officer Ross during the incident (Gov't Hr'g Ex. 5); photographs of the firearm that

---

[1] Defendant's motion mentions suppression of only the firearm and not the ammunition.  (*See generally* Doc. No. 20.)  But because the ammunition was in the firearm on the night of Springs's arrest (Rough Draft Jan. 12, 2026 Hr'g Tr. at 25:14–15), and the Government responds to the motion as though it seeks suppression of all the evidence obtained, the Court views the motion as seeking suppression of the firearm *and* the ammunition (*see* Doc. No. 23 at 2, 5).

[2] The parties have not identified Officer Hatter's first name.  Curiously, Officer Ross did not mention Officer Hatter in any of the paperwork he completed following Springs's arrest.

Officer Ross recovered from Defendant (Gov't Hr'g Ex. 2, 3); Ring camera footage from a home in the neighborhood (Gov't Hr'g Ex. 4); and Officer Ross's arrest memorandum (Gov't Hr'g Ex. 6). Defendant testified on his own behalf and introduced Ring camera footage from other homes in the neighborhood (Def. Hr'g Exs. 1, 2), along with the transcript from Defendant's preliminary hearing in state court (Def. Hr'g Ex. 12).

For the reasons discussed below, the Court grants Defendant's motion.

## I.    FACTUAL BACKGROUND

On April 18, 2025, at approximately 11:20 p.m., Officer Ross and his partner, Officer Hickey,[3] were on a routine patrol near the 2100 block of Judson Street in North Philadelphia, when a supervisor directed them to disperse a gathering[4] on the 2000 block of Judson Street.[5] (Rough Draft Jan. 12, 2026 Hr'g Tr. at 10:9–18, 40:5–8.) It was the Friday before Easter, and residents on the block were outside on their front lawns grilling and talking to neighbors. (*Id.* at 78:13–15, 79:7–8.) As the officers drove down the street in a marked wagon, Officer Ross, who was in the passenger seat, saw a man, later identified as Defendant, standing on the curb. According to Officer Ross, Defendant stared at the wagon with a "deer in the headlights" look and made "a quick motion as he pulled up on his waistband and pulled his shirt down." (*Id.* at 13:4–23; *see also* Gov't Hr'g Ex. 1 at 23:26.20 to 23:26.35 (describing Defendant's face to his

---

[3] The parties have not identified Officer Hickey's first name.

[4] The Government describes the situation as "an unauthorized block party," suggesting the gathering was one which would have required a permit under the City of Philadelphia Code. (Doc. No. 23 at 2); *see also* Phila. City Code § 11-101(1) ("*Block Party*. A neighborhood celebration or event, sponsored by the residents of a block, that requires the temporary closure of the street of the block, or a portion thereof."). But Ring camera footage introduced at the hearing shows that, although there was a crowd of people and individuals moving between homes, cars were also able to freely drive down the street. (*See* Def. Hr'g Exs. 1, 2.) Accordingly, the Court refers to it as a "gathering" and nothing more in this Memorandum.

[5] Officer Ross testified that the primary objective when disbursing a crowd is to ask residents to go inside or relax on their front porches if they do not want to call it a night. (Rough Draft Jan. 12, 2026 Hr'g Tr. at 11:19–24.)

fellow officers as giving an "oh shit" look).)  At the time, Defendant was wearing black sweatpants, a white t shirt, and a black jacket.  (Rough Draft Jan. 12, 2026 Hr'g Tr. at 80:19–22.)

Defendant denies making any motion toward his waistband.  (*Id.* at 80:13–14.)  And although Officer Ross interpreted Defendant's "quick motion" as possibly an attempt to conceal a firearm, Officer Ross did not say anything to Officer Hickey before exiting the vehicle.  (*Id.* at 56:5–9.)  Instead, he got out of the wagon and met Officer Hatter, who had arrived in his own marked vehicle, at the back of the wagon.  (Gov't Hr'g Ex. 1 at 23:20.17.)  At the evidentiary hearing, Officer Ross testified that he told Officer Hatter, "this male right here, he may be carrying a firearm," while pointing toward Defendant.  (Rough Draft Jan. 12, 2026 Hr'g Tr. at 14:4–7; *see also* Gov't Hr'g Ex. 4 at 23:20.13 (video of Officer Ross pointing toward Defendant as Defendant walks down the sidewalk).)  However, on the night of the incident and at the preliminary hearing in state court, Ross recounted telling Officer Hatter only, "get him, him right there," and does not mention having told Officer Hatter his suspicion that Defendant was carrying a firearm.  (Gov't Hr'g Ex. 1 at 23:20.12 to 23:20.13; *id.* at 23:26.20 to 23:26.30; *see also* Def. Ex. 12 at 11:19–12:23.)[6]

Defendant began walking away down the sidewalk after he stared at the marked wagon. (Rough Draft Jan. 12, 2026 Hr'g Tr. at 13:22–23, 82:5–9.)  Officers Ross and Hatter immediately followed him, walking north on Judson Street.  (Gov't Hr'g Ex. 1 at 23:20.18.)  At this point, the two officers were eleven seconds behind Defendant.  (*See* Gov't Hr'g Ex. 4 at 23:20.12 to 23:20.22 (showing Defendant passing the front of a parked car eleven seconds before the officers pass the front of the same parked car).)  Before long, neighbors began calling out,

---

[6] And, during the evidentiary hearing, Officer Ross testified that from his experience the gesture was someone "basically either [trying to] fix their self or conceal a firearm."  (Rough Draft Jan. 12, 2026 Hr'g Tr. at 13:8–9.)

seemingly to warn Defendant that the officers were following him.  (Gov't Hr'g Ex. 4 at 23:20.26.)  Two seconds after the shouting began, Defendant reached the corner of Judson and Diamond Streets and turned right onto Diamond Street.  (Gov't Hr'g Ex. 5 at 23:20.28.)

At this point, all three men began running.  Officer Ross testified that he only began running *after* he saw Defendant turn the corner and start running.  (Rough Draft Jan. 12, 2026 Hr'g Tr. at 14:13–14, 16:21–17:3.)  Defendant, by contrast, testified that he only started running because he saw Officers Ross and Hatter chasing him.  (*Id.* at 82:16–21.)  A review of the officers' body camera footage reveals Defendant was walking when Officer Ross first began to run.  (*Compare* Gov't Hr'g Ex. 5 at 23:20.27 to 23:20.28 (showing Defendant walking), *with* Gov't Hr'g Ex. 1 at 23:20.27 to 23:20.28 (showing Officer Ross begin to run).)

Once the running began, the foot pursuit lasted approximately 30 seconds.  (Gov't Hr'g Ex. 1 at 23:20.28 to 23:20.58.)  During the pursuit, Defendant turned right off Diamond Street, onto North 23rd Street, just before the officers caught up with him.  (*Id.* at 23:20.44.)  Officer Hatter yelled, "taser," and Officer Ross pointed his taser at Defendant and told him to get on the ground.  (*Id.* at 23:20.59; *id.* at 23:27.24 to 23:27.27; Rough Draft Jan. 12, 2026 Hr'g Tr. at 18:4–14.)  Defendant complied, and once he was fully on the ground, Officer Ross holstered his taser, ordered Defendant to place his hands behind his back, and placed Defendant in handcuffs.  (Gov't Hr'g Ex. 1 at 23:20.59 to 23:21.21.)  Officer Ross also radioed that he had a stop at "2000 23rd Street."  (*Id.* at 23:21.09 to 23.21.11.)  He did not mention that Defendant was potentially armed during the dispatch.  (*Id.*)  After Defendant was handcuffed, Officer Ross rolled him over and saw an L-shaped bulge protruding from Defendant's front waistband.  (Gov't Hr'g Ex. 1 at 23:21.30 to 23:21.35; Rough Draft Jan. 12, 2026 Hr'g Tr. at 19:3–6, 23:25–

24:5.) Officer Ross relayed to Officer Hatter that Defendant had a gun and removed the firearm from Defendant's pants. (Gov't Hr'g Ex. 1 at 23:21.34–23:21.40.)

The recovered firearm was a black and purple Glock 43x, 9mm semi-automatic pistol bearing serial number BUKP941, loaded with 11 live rounds of ammunition. (Rough Draft Jan. 12, 2026 Hr'g Tr. at 25:7–17; *see also* Gov't Hr'g Ex. 3.) The firearm was reported stolen in 2022. (Rough Draft Jan. 12, 2026 Hr'g Tr. at 25:7–17.) And when Officer Ross conducted a National Crime Information Center search on Defendant, he saw that Defendant did not have a permit to carry in Pennsylvania. (*Id.* at 18–21.) Defendant was then placed under arrest.

## II.    PROCEDURAL HISTORY

On July 17, 2025, Defendant was indicted by a grand jury and charged with one count of possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. No. 1.) He now moves to suppress the physical evidence that police obtained from his person on the night of the arrest because the stop violated his Fourth Amendment rights. (Doc. No. 20.) Specifically, Defendant argues that Officers Ross and Hatter lacked reasonable suspicion to conduct an investigatory stop because: (1) prior to Defendant submitting to the officers, there was nothing to suggest Defendant was doing anything illegal and (2) the officers cannot rely on Defendant's flight because it was provoked by their chase. (*Id.* at 7–29.)[7]

The Government opposes the motion. (Doc. No. 23.) It emphasizes that the stop occurred in a high crime area and that when the officers arrived on the scene, Officer Ross saw

---

[7] In the alternative, Defendant argues that the seizure was unconstitutional because by chasing Defendant while saying, "get him, him right there," telling Defendant to get on the ground, pointing a taser at him, and handcuffing him, the officers transformed the stop into a de facto arrest, which was conducted without probable cause. (Doc. No. 20 at 30–33.) And Defendant argues that the search of his person was unconstitutional because the officers lacked reasonable suspicion that Defendant was armed and dangerous at the time of the stop. (*Id.* at 29–30.) Because the Court finds the officers lacked reasonable suspicion to conduct an investigatory stop, we need not address Defendant's alternative arguments.

Defendant motion toward his waistband as if to conceal a firearm and immediately walk away at a fast pace, while nervously looking back at the officers. (*Id.* at 11–12.) The Government argues that these facts, when combined with Defendant's unprovoked flight, support a reasonable suspicion that Defendant was unlawfully carrying a firearm. (*Id.*)

On January 12, 2026, the Court held an evidentiary hearing at which Officer Ross and Defendant testified. The motion is now ripe for decision.

## III. LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To invoke this protection, a defendant challenging a search or seizure through a motion to suppress bears the burden of establishing that his Fourth Amendment rights were violated. *See United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011); *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *see also United States v. Cole*, 425 F. Supp. 3d 468, 484 (W.D. Pa. 2019) ("The defendant's burden is easily satisfied when law enforcement conducted the challenged search or seizure without a warrant."). The Government must satisfy its burden of proof by a preponderance of the evidence. *See United States v. Bey*, 911 F.3d 139, 145 (3d Cir. 2018).

## IV. DISCUSSION

Defendant challenges his seizure by Officers Ross and Hatter as unconstitutional. Because "there can be no Fourth Amendment violation until a seizure occurs," the Court must first determine whether and when Defendant was seized within the meaning of the Fourth Amendment. *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000); *see United States v.*

6

*Brown*, 448 F.3d 239, 245 (3d Cir. 2006) ("We begin by determining when the seizure of Brown occurred, as that is the moment 'the Fourth Amendment becomes relevant.'" (quoting *Terry*, 392 U.S. at 16)).  "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" *Brown*, 448 F.3d at 245 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

The Court agrees with the parties that Defendant's seizure occurred when he laid face down on the ground after Officer Ross pointed a taser at him.  The officers' actions—chasing Defendant, yelling at him to get on the ground, and pointing a taser at him—would have conveyed to a reasonable person that they were not free to move.  *See Brown*, 448 F.3d at 245–46 ("[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." (quoting *Hodari D.*, 499 U.S. at 628)).  And Defendant submitted to this "show of authority" by stopping, raising his hands, and lying face down on the ground.  *See id.* at 246.  Accordingly, the Court considers whether Officers Ross and Hatter had reasonable suspicion to seize Defendant at that point.

"Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause."  *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)).  It is well-settled, however, that "under the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1 (1968), 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'"  *Brown*, 448 F.3d at 244 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123

(2000)). "Any evidence obtained pursuant to an investigatory stop . . . that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

"Reasonable suspicion is an 'elusive concept,' but it unequivocally demands that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* at 246 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *see also United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) (explaining that the "centerpiece" of the Supreme Court's analysis in *Wardlow* was "whether the defendant's behavior pointed to the presence of illegal activity"). In assessing whether reasonable suspicion exists, this Court must consider the totality of the circumstances (i.e., "the whole picture"). *See United States v. Goode*, 486 F. App'x 261, 264 (3d Cir. 2012); *see also, e.g.*, *United States v. Colen*, 482 F. App'x 710, 712 (3d Cir. 2012); *United States v. Sears*, 835 F. App'x 671, 674 (3d Cir. 2020) ("To evaluate reasonable suspicion, we consider the totality of the circumstances, including, as relevant here, (1) a high crime rate in the area, (2) a late hour at night, (3) nervous or evasive behavior by the suspect, and (4) other behavior by the suspect that indicates criminal activity to a police officer's expert eye." (cleaned up)). "The ultimate question is whether a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying [the] detention." *Brown*, 448 F.3d at 246–47 (quoting *Johnson*, 332 F.3d at 206)). In conducting this analysis, "[c]ourts give considerable deference to police officers' determinations of reasonable suspicion." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006).

Here, the Government argues that Officers Ross and Hatter reasonably suspected that Defendant may have been illegally carrying a firearm because the stop occurred (1) at night in a high crime area, (2) after Officer Ross saw Defendant motion toward his waistband as if

concealing a firearm, and (3) after Defendant nervously walked, and later ran, from them.  (Doc. No. 23.)  The Court considers each point in turn before considering whether, taken together, the totality of the circumstances supports a finding of reasonable suspicion.

*First*, Defendant does not dispute that the stop occurred late at night in a high crime area.[8]  An "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124; *accord United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004). But it does support a finding of reasonable suspicion, as an officer is not "required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124.

Here, the Court finds the area's classification as a high crime area is relevant but not entitled to substantial weight in the context of this case.  When Officers Ross, Hickey, and Hatter arrived on the block, Defendant was attending a neighborhood gathering on Easter weekend. (*See generally* Def. Hr'g Ex. 1.)  Children were running from house to house, and adults were

---

[8] As the Government notes, the 2000 block of Judson Street is justifiably "considered a high crime area":

> In his time with PHA, Officer Ross has made numerous firearms arrests in this immediate area. Prior to this incident, he arrested an individual with a firearm one block away on North 24th Street. PHA has also responded to several shootings in the immediate area. There are two housing developments in this neighborhood—Raymond Rosen and Johnson Homes—that are often involved in violent altercations, including retaliatory shootings. Recently, there was a shooting on a neighboring block of Judson Street. As a result of the ongoing violence in the neighborhood, the Philadelphia Police Department ("PPD") stationed a violent crime beat at 23rd and Diamond Streets, where the arrest took place. PHA Officer Ross has recently been selected by PPD's 22nd District to ride with PPD's tactical unit in an effort to combat the ongoing violence in the area.

(Doc. No. 23 at 3; *see also* Rough Draft Jan. 12, 2026 Hr'g Tr. at 8:4–13 (discussing gun violence in the area); *id.* at 9:9–24 (same).)

chatting with their neighbors. (*Id.*) Tellingly, Officer Ross testified that when they arrived on the scene, there had been *no* reports of illegal activity. (Rough Draft Jan. 12, 2026 Hr'g Tr. at 43:25–44:13.) The situation was thus a far cry from the one at issue in *Wardlow*, where the defendant was spotted holding an opaque bag "in an area known for heavy narcotics trafficking" and where the officers "expected to find a crowd of people . . . *including* lookouts and customers." 528 U.S. at 121 (emphasis added); *see also United States v. Navedo*, 694 F.3d 463, 472 (3d Cir. 2012) ("This is also not the case in which police officers patrolled an area known for heavy narcotics trafficking where police expected to encounter drug dealers, their customers, or 'lookouts' as in *Wardlow*."); *United States v. Alvin*, 701 F. App'x 151, 155 n.32 (3d Cir. 2017) (distinguishing *Wardlow* and noting that based on the facts presented in *Wardlow*, the officers in that case had "reason to believe that [the defendant] was either a lookout or a seller of drugs").

Because there was nothing to suggest to the officers that criminal activity was afoot when they arrived on scene, let alone anything to connect Defendant to criminal activity, the Court affords the high crime nature of the area less weight than it might in other cases. *See United States v. McCray*, 148 F. Supp. 2d 379, 386–87 (D. Del. 2001) ("[T]he area's reputation for narcotics activity and the late hour of the evening are not objective factors that contribute to reasonable suspicion within the context of this stop. . . . In this case, the area around Seventh and Jefferson Streets, although considered a high crime area, is also a residential neighborhood. . . . In addition, although 10:45 p.m. is late, it is not unheard of for neighbors in a community to stand outside and talk late on a summer evening. It is certainly not suspicious conduct for people who know each other to stand in their own community and have a conversation late at night on a summer evening." (citations omitted)); *United States v. Fox*, No. 10cr0048, 2011 WL 841315, at *3 (D.V.I. Mar. 8, 2011) (noting that the area where defendant

10

was arrested contained multiple bars and restaurants that stayed open late, "[t]hus Defendant's mere presence at 10 p.m. on the western end of Company Steet, an arguably high crime area, does not 'eliminate a substantial portion of innocent travelers,' and is not a particularly strong gauge that 'criminal activity is afoot'"; in addition, "[p]olice did not provide any link between the location and time of night with any alleged criminal activity by *defendant*.  On the whole, the location and timing of where police observed Defendant are not particularly strong facts in support of reasonable suspicion" (quoting *United States v. Mathurin*, 561 F.3d 170, 174 (3d Cir. 2009))); *United States v. Saroeuth*, No. 10cr462, 2011 WL 1457168, at *6 (E.D. Pa. Apr. 12, 2011) ("The events leading up to the pursuit included a dispersing crowd in a high crime area, however, the people were walking, and not running away.  Thus, no criminal activity was afoot when the officers arrived at the scene.").

**Second**, Defendant disputes Officer Ross's assertion that he saw Defendant make a motion at his waistband, and Defendant argues that even if the Court accepts Officer Ross's account, there are too many innocent explanations for this one motion for this fact to carry much weight in the reasonable suspicion analysis.  (Doc. No. 20 at 13; Rough Draft Jan. 12, 2026 Hr'g Tr. at 92:11–93:7, 95:18–96:10.)  The Court agrees.  Officer Ross testified that he saw Defendant "pull[ing] up on his waistband and pull[ing] his shirt down" as the police wagon pulled up to the gathering.  (Rough Draft Jan. 12, 2026 Hr'g Tr. at 13:7.)  But the physical characteristics of the scene make this highly improbable.  When Officer Ross arrived at the scene, it was dark and Defendant was standing on the sidewalk.  (*Id.* at 52:4–53:8.)  Officer Ross, who was in the passenger seat of the police wagon, would have been looking at Defendant through the driver's side window of a moving car.  (*Id.*)  Defendant was also one member of a dispersing crowd, and he was on an angle standing on the curb in the dark and wearing baggy, black clothing, with

11

multiple parked cars between himself and Officer Ross. (*See id.* at 12:16–21 (Officer Ross testifying that Defendant was "on an angle" as the wagon approached and that he "had to turn his body to look at" the wagon as it was approaching); *id.* at 16:17–20 (Officer Ross testifying that when the officers arrived "there were individuals all around us"); *id.* at 58:21–60:3 (Officer Ross confirming that "in addition to all of those cars," it was dark out at the time he encountered Defendant); *id.* at 80:19–22 (Defendant testifying that he was wearing "a black jacket below my waist, some black pants, a white t-shirt"); *see also, generally*, Gov't Hr'g Ex. 4 (video confirming Defendant was walking along the sidewalk behind multiple parked cars).)

In addition, there are multiple discrepancies between Officer Ross's testimony during the evidentiary hearing, his actions and comments at the scene, and his paperwork following the arrest, which call into question his account. As detailed above, Officer Ross testified before this Court that when the police wagon approached the scene, he clearly saw Defendant make a single quick motion at his waistband, which suggested to him that Defendant was carrying a firearm. (Rough Draft Jan. 12, 2026 Hr'g Tr. at 13:4–23.) But Officer Ross did not activate his body camera when he first approached Defendant the scene. (*See generally* Gov't Hr'g Ex. 1; Rough Draft Jan. 12, 2026 Hr'g Tr. at 14:15–20.)[9] Nor did Officer Hatter mention a firearm to Officer Hickey before exiting the vehicle or in his radio report upon initially detaining Defendant. (Rough Draft Jan. 12, 2026 Hr'g Tr. at 72:15–20; Gov't Hr'g Ex. 1 at 23:29.09 to 23:29.11); *see also Saroeuth*, 2011 WL 1457168, at *6 ("According to Officer Newell, based on his experience, the way in which Defendant clutched his pocket aroused the officers' suspicion that Defendant

---

[9] Officer Ross did not activate his body camera until he was running after Springs. (Rough Draft Jan. 12, 2026 Hr'g Tr. at 14:15–15:6.) Once activated, the camera "goes back and records the minute prior" to the activation without audio. (*Id.* at 15:7–19 (explaining that when watching Officer Ross's body camera footage, the "first minute will have no audio and then once [it] hit[s] a minute," which reflects when Officer Ross activated the camera, the audio begins).)

12

was carrying a gun.  However, as Defendant aptly points out, Officer Newell failed to indicate this suspicion in his flash report over the radio while pursuing Defendant.").[10]

And when Officer Ross described the arrest after the fact, his stories were inconsistent on this point.  While still at the scene, Officer Ross described Defendant's subtle motion to his fellow officers—but not when recounting the incident to his supervisor.  (*Compare* Gov't Hr'g Ex. 1 at 23:26.22–23:26.25 (Officer Ross telling his fellow officers that Defendant was "the one doing like this [holding his waist] while walking away"), *with id.* at 23:26.55–23:26.58 (Officer Ross describing the incident to his supervisor as, "we hop out, he started looking, walking, [we] chased him"), and *id.* at 23:27.48–23:27.59 (Officer Ross describing the incident to his supervisor as "he was in the crowd, so he saw me hop out and as soon as we hop out, he was looking.  I went to approach him you know and just to talk to him and he took off").)  And although Officer Ross mentions the motion in his arrest memo, his account is different from the one he gave at the evidentiary hearing, stating that *after* exiting the wagon, he "observed . . . defendant in the crowd *tugging* at his waist band area" and that Defendant kept "his hands . . . in his waistband area" as he was walking away from the officers.  (*See* Gov't Hr'g Ex. 6 (emphasis added).)

---

[10] And although Officer Ross testified that he mentioned the gun to Officer Hatter when they started walking after Defendant, that was the *first* time he mentioned saying as much to Officer Hatter. Notably, when recounting the incident immediately after the fact, he recounted telling Officer Hatter, "get him, him right there" (Gov't Hr'g Ex. 1 at 23:20.12 to 23:20.13; *id.* at 23:26.20 to 23:26.30), and during the preliminary hearing, Officer Ross testified that he told Officer Hatter that he "was going to conduct a mere encounter" (Def. Hr'g Ex. 12 at 12:18–20).  At neither point did Officer Ross mention telling Officer Hatter that he suspected Defendant was carrying a gun.  Officer Hatter did not testify at the evidentiary hearing or the preliminary hearing, so the Court does not have his recollection of events. Confusingly, Officer Ross's actions after the incident suggest he wanted to obfuscate Officer Hatter's involvement in the arrest.  He told Officer Hickey not to mention Officer Hatter in the paperwork related to the arrest (*see* Rough Draft Jan. 12, 2026 Hr'g Tr. at 63:20–64:25), and Officer Ross did not give Officer Hatter's name when questioned at the preliminary hearing (*see generally* Def. Hr'g Ex. 12).

Given the physical characteristics of the scene and the inconsistencies in Officer Ross's recollections, the Court cannot credit Officer Ross's testimony that he saw Defendant motion toward his waistband as the police wagon arrived on the scene.[11]  Accordingly, the Court does not consider this fact when analyzing whether the officers had reasonable suspicion to stop Defendant.[12]

***Third***, Defendant argues that the Court should entirely disregard his flight from the scene because the video evidence shows that Defendant ran from Officers Ross and Hatter only *after* he saw the officers running toward him.  (Doc. No. 20 at 16–17.)  Defendant then reasons that because Officer Ross started running first, Defendant's flight was provoked and should not be considered at all in the reasonable suspicion analysis.  (*Id.*)  The Government responds that

---

[11] Other evidence also makes the Court question the veracity of Officer Ross's account when it comes to seeing Defendant motion toward his waistband.  Tellingly, Officer Ross's own testimony suggests that when he arrived at the scene, he may have been looking to make a firearms arrest.  Officer Ross is a self-described "aggressive" officer, who is known for making firearms arrests in this area.  (Rough Draft Jan. 12, 2026 Hr'g Tr. at 43:10–24.)  And as the officers were driving to the area, Officer Ross told Officer Hickey that they should "watch the crowd"; he also bragged to his fellow officers after the fact that he knew as soon as he saw Defendant that they needed to "get him, him right there."  (Gov't Hr'g Ex. 1 at 23:26.20–23:26.35.)

[12] Even if the Court could credit Officer Ross's testimony, it would not move the needle in this case.  Officer Ross testified at the evidentiary hearing that he saw Defendant pull at his waistband only one time, and he did not see a gun or a bulge that would suggest Defendant had a firearm.  (Rough Draft Jan. 12, 2026 Hr'g Tr. at 54:10–19.)  There are too many innocent explanations for this behavior—especially in the context of this case—for it to move Officer Ross's "hunch" that Defendant had a gun into the realm of reasonable suspicion.  *See United States v. Fox*, 2011 WL 841315, at \*4 (D.V.I. Mar. 8, 2011) ("Defendant's hand movements in these circumstances—putting his hand in his pocket on two occasions—is simply too innocent and normal of a behavior to signal that criminal activity may have been afoot.  Cases relying on the placing of hand in a pocket as a basis for reasonable suspicion involve facts showing that it was linked to potential criminal conduct." (collecting cases)); *cf. Johnson v. Campbell*, 332 F.3d 199, 209 (3d Cir. 2003) ("We do not doubt Price's credibility, nor her training and experience.  We also do not doubt that the previous robbery may have been in her mind and that she was frightened when she asked her husband to call the police.  But no amount of training, experience, or subjective nervousness can turn the simple, objective facts that Johnson was drinking coffee, flipping through a newspaper, pacing, and rubbing his head into articulable suspicion that Johnson was about to commit a crime.").  Indeed, at the evidentiary hearing, Officer Ross himself testified that the motion could have just been someone trying to "*fix their self* or conceal a firearm."  (Rough Draft Jan. 12, 2026 Hr'g Tr. at 13:8–9 (emphasis added).)

Defendant, not Officer Ross, ran first, and therefore, his flight is entitled to substantial weight under the Supreme Court's holding in *Wardlow*.  (Doc. No. 23 at 9.)  The Court agrees with Defendant that his flight was provoked; however, that does not mean his actions are entitled to no weight in the reasonable suspicion analysis.

To begin, this case does not present the "headlong flight" at issue in *Wardlow*.  528 U.S. at 123.  In *Wardlow*, the defendant immediately "fled upon seeing police officers patrolling" the area.  *Id.* at 121.  The Supreme Court emphasized that this "unprovoked flight" was a pertinent factor in the reasonable suspicion determination because headlong flight is "the consummate act of evasion"; although "not necessarily indicative of wrongdoing, . . . it is certainly suggestive of such."  *Id.* at 124.  Here, by contrast, the video evidence shows Defendant initially walking, not running, away from Officers Ross and Hatter, who were clearly pointing and walking after him.  (*See generally* Gov't Hr'g Ex. 4.)  Officer Hatter's body camera footage shows Defendant walking under a bay window as he neared the corner of Judson and Diamond Streets at the same time onlookers began yelling, apparently trying to warn Defendant that he was being followed by the police.  (*Compare* Gov't Hr'g Ex. 4 at 23:20.26 to 23:20.31 (members of the public yelling "a-yo, a-yo, a-yo"), *with* Gov't Hr'g Ex. 5 at 23:20.26 to 23:20.28 (showing Defendant walking).)  Just before Defendant reaches the corner and goes out of sight, Officer Ross began to run.  (*Compare* Gov't Hr'g Ex. 5 at 23:20.27 to 23:20.28 (showing Defendant walking), *with* Gov't Hr'g Ex. 1 at 23:20.27 to 23:20.28 (showing Officer Ross begin to run).)  Although the videos do not show the exact moment Defendant also started running, it is clear that he did not start to run *before* Officer Ross.

Thus, taking the entire sequence as a whole, Defendant only broke into a run after:  (1) two uniformed officers exited marked vehicles and pointed toward him while saying something

to the effect of "get him, him right there"; (2) walked quickly and purposefully after him for about ten seconds; and (3) began running after him as he turned the corner. The Court agrees with Defendant that his flight was provoked and that this is a far cry from the "unprovoked, headlong flight" at issue in *Wardlow*. *See United States v. McCray*, 148 F. Supp. 2d 379, 389 (D. Del. June 7, 2001) ("The facts in McCray's case are clearly distinguishable from *Wardlow*. According to both the officers' and Wallace's testimony, McCray and Wallace continued walking when the officers arrived. The record before the court clearly demonstrates that there was not the same sort of unprovoked, headlong flight that there was in *Wardlow*.").

That does not, however, mean that Defendant's actions should be entirely disregarded. The Third Circuit has advised that even "[w]alking away from the police . . . is a factor that can be considered" in the reasonable suspicion analysis. *Valentine*, 232 F.3d at 357; *see also United States v. Pritchett*, No. 21cr59, 2023 WL 2327899, at *1 (D. Del. Mar. 2, 2023). *Pritchett* is instructive. In that case, the defendant was standing on a sidewalk with a group of people when someone further down the street warned the group that police were about to turn onto the street in an unmarked vehicle. 2023 WL 2327899, at *1. When the defendant noticed the police vehicle, he "turn[ed] the right side of his body—the side on which he carried [a black] satchel— away from their vehicle, grab[bed] a woman who was standing nearby around the neck or shoulder, pull[ed] her close to his right side and walk[ed] at a fast pace southbound towards a courtyard." *Id.* The officers walked after him, calling for him to "stop, police." *Id.* The defendant picked up his pace; the officers began to run towards him; and the defendant pushed the woman away, running into the rear of a home near the courtyard. *Id.* at *2. The court found that "Defendant's initial act of walking away from the vehicle does not amount to the headlong flight at issue in *Wardlow*," nor did his act of running into the residence "upon having two

16

officers begin running towards him." *Id.* at *5–6.  Instead, the defendant's "evasive conduct" fell somewhere between "the act of merely walking away or refusing to cooperate" and "*Wardlow*-like flight." *Id.*  And that fact went to the weight of the evidence in the reasonable suspicion inquiry. *Id.* at *6.  On appeal, the Third Circuit affirmed, explicitly rejecting the government's argument that the "District Court wrongly discounted Pritchett's flight under *Wardlow*." *United States v. Pritchett*, No. 23-2005, 2024 WL 2131524, at *3 (3d Cir. May 13, 2024) ("The District Court did not clearly err in assigning these facts little weight.").

Here, as in *Pritchett*, the Court finds that Defendant's conduct falls somewhere between mere evasive conduct and the headlong flight at issue in *Wardlow*.  The video evidence shows Defendant walked away from the gathering, while repeatedly and nervously looking back at the officers, who were clearly tailing him.  And as Defendant turned the corner, he started running away from the officers, who had, at that point, begun to run after him.  This fact is, therefore, entitled to some weight in the reasonably suspicion analysis, albeit less than would be given in the case of a headlong, *Wardlow*-like flight.[13]

*    *    *

---

[13] The Court notes that Officer Ross himself did not believe he could conduct an investigatory stop without Defendant's "unprovoked flight."  Throughout the evidentiary hearing, Officer Ross testified that up until the moment Defendant ran, he subjectively believed was only able to conduct a "mere encounter" with Defendant.  (Rough Draft Jan. 12, 2026 Hr'g Tr. at 38:3–12 ("What drew my attention was the tugging, the nervous look, but that wasn't enough at that time so that's why I stated we went with the mere encounter . . . . Once the male went into unprovoked flight in a high crime area, at that time I had enough probable cause to effect—for pursuit of the male . . . . But it was the unprovoked flight which basically started all of this."); *see also, e.g.*, *id.* at 15:21–16:9 ("So the legal standard to go with this was to just a conduct a mere encounter . . . . I didn't have enough to make it a pedestrian investigation at that point."); *id.* at 18:21–24 ("[D]ue to the unprovoked flight, also the male adjusting his waistband, the high crime area, at that point I felt I had enough to conduct the *Terry* stop based on the totality of the circumstances.").)  But as noted above, the Court finds Defendant ran *after* Officer Ross ran, so there was no "unprovoked flight" from which Officer Ross could develop a reasonable suspicion of criminal activity.  In other words, by his own terms, Officer Ross lacked reasonable suspicion to stop Defendant.

Having individually considered each fact, whether it should be considered, and if so, the weight it should be afforded, the Court must now consider whether the circumstances in their totality show that Officers Ross and Hatter reasonably suspected Defendant was engaged in criminal activity when they stopped him. The Court finds they do not. When Defendant was seized, the officers knew little more than that Defendant nervously walked away from a neighborhood gathering (albeit in a high crime area) when multiple marked police cars arrived at the scene, and that Defendant began to run once the officers gave chase. *See United States v. Sears*, 835 F. App'x 671, 674 (3d Cir. 2020) ("[A]t the moment of seizure, the officers had reliably observed little more than Sears walking away from them in a high-crime area at night, which does not rise to the level of reasonable suspicion."); *United States v. Pritchett*, 2023 WL 2327899, at *6 & n.13 (D. Del. Mar. 2, 2023) ("[T]he evidence that remains is the following: (1) Defendant's 'blading' away from the unmarked vehicle and pulling a woman to the side on which he carried a satchel, (2) Defendant's act of walking away upon looking towards the vehicle and picking up his pace after Officer Williams issued commands and (3) Defendant's act of running into the house after the Officers began running towards him. The Court finds that the totality of the evidence here is insufficient to support a finding of reasonable suspicion. . . . [E]ven if the Court were to find that the area is high crime, the totality of the circumstances would not support a finding of reasonable suspicion. . . . The evidence pertaining to Defendant's furtive movements and evasive conduct is too weak to support a finding of reasonable suspicion even in a high crime area."); *cf. United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) ("[W]e conclude that the officers had reasonable suspicion after they received the face-to-face tip, were in a high-crime area at 1:00 a.m., and saw Valentine and his two companions walk away as soon as they noticed the police car.").

18

## V.    CONCLUSION

Officer Ross described the encounter as "fate," but the Court believes it more accurate to describe it as a "hunch."  And, although it was a correct "hunch," the totality of the circumstances does not rise to the level of reasonable, particularized suspicion that criminal activity was afoot as required to justify a *Terry* stop.  Accordingly, the Court grants Defendant's motion to suppress.  An appropriate Order follows.